United States Court of Appeals
Fifth Circuit

**F I L E D**

June 22, 2007

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 06-60737
Summary Calendar

_____

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

ALLIED AVIATION FUELING OF DALLAS LP,

Respondent.

_____

On application for enforcement of an order of
the National Labor Relations Board

_____

Before JOLLY, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:

The National Labor Relations Board ("the Board") seeks enforcement of an order

issued against Allied Aviation Fueling of Dallas ("Allied") in response to its alleged

violations of the National Labor Relations Act ("NLRA"). Allied contests part of the order

and raises no challenge to the remainder. For the following reasons, we GRANT the

Board's application.

# I. FACTS AND PROCEEDINGS

The following facts are not disputed by the parties. Allied provides jet fuel for commercial airlines at Dallas-Fort Worth International Airport. At all relevant times, Allied and the Transport Workers Union of America, Air Transport Local 513 ("the Union") were parties to a collective bargaining agreement ("CBA"). Article 28(f) of the CBA requires employees to submit grievances within seven days of any alleged violation of the agreement. The time limit was understood by the parties to be strictly construed, and failure to file a grievance within the time period was grounds for Allied to reject the grievance.

Patrick Sanford worked for Allied for 22 years, most recently serving as a facilities mechanic. Sanford also served as Maintenance Section Chairman of the Union, making him responsible for representing 45 employees. Sanford's Union responsibilities included ensuring that grievances were timely filed.

In February 2005, Sanford spoke with Allied's maintenance manager, Jerry Keeney, to complain about Allied's practice of outsourcing some of its maintenance work. Keeney promised that the practice would cease.

On March 2, 2005, Sanford learned that Allied had outsourced maintenance on one of its vehicles despite Keeney's assurance to the contrary. Sanford informed his Union superiors about the incident, and they directed him to file grievances on behalf of the two employees—Larry Rottham and David Thompson—who would have been entitled to overtime if the work had not been outsourced.

Sanford prepared the grievances for Rottman and Thompson to sign. He got Rottman's signature, but was unable to obtain Thompson's signature despite assigning a union steward to the task. On March 9, with the CBA's deadline approaching, Sanford signed Thompson's name to the form and filed it, in order to preserve Thompson's rights.

When Thompson found out that a grievance had been filed on his behalf, he was upset with Sanford for doing so. On March 16, Sanford arrived at work early to explain his actions to Thompson and offer to withdraw the grievance. Sanford spoke to Keeney the same day and confessed to having signed Thompson's grievance. Sanford then told Keeney that the Union would withdraw the grievance, and Keeney assured Sanford that Thompson would not suffer any retaliation due to the filing of the grievance.

On April 8, Keeney told Sanford that he was suspended pending an investigation into his having signed Thompson's grievance. On April 15, Keeney and Allied's Operations Manager, Joe Correa, informed Sanford that he was being discharged for signing Thompson's name to the grievance. In a letter dated April 20, Keeney explained that Sanford was discharged for "dishonesty, falsifying company documents, and fraud against Allied Aviation," all allegedly in violation of Article 28(b) of the CBA.[1]

The Board found that Allied violated Chapter 7 of the NLRA by suspending and discharging Sanford for signing Thompson's name to the grievance. *See* 29 U.S.C. §§ 158(a)(1), (3) (prohibiting employers from interfering with the exercise of rights

---

[1] Article 28(b) allows Allied to "discharge or discipline any employee for incompetency, disobedience, dishonesty, disorderly conduct, negligence, absenteeism, or any just and proper cause."

guaranteed under the NLRA).  The NLRB also found that Allied violated the NLRA by unilaterally changing its drug testing policy.[2]

## II.  STANDARD OF REVIEW

We review the Board's findings of fact for "substantial evidence."  29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.").  "Substantial evidence is 'such relevant evidence that a reasonable mind would accept to support a conclusion.'" *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  In determining whether the Board's factual findings are supported by the record, we do not make credibility determinations or reweigh the evidence.  *NLRB v. Cal-Maine Farms, Inc.*, 998 F.2d 1336, 1339–40 (5th Cir. 1993).  The Board's legal conclusions are reviewed de novo.  *NLRB v. Thermon Heat Tracing Servs., Inc.*, 143 F.3d 181, 185 (5th Cir. 1998).

## III.  DISCUSSION

Allied asserts that the Board's factual findings were not supported by substantial evidence and that the Board made an error of law.  In particular, Allied asserts that (1) the Board failed to give sufficient weight to the allegation that Sanford forged Thompson's

---

[2] On April 7, 2005, Allied changed its drug testing policy unilaterally over the Union's objections, expanding the reasons for which an employee could be tested, resulting in a dramatic increase in the number of employees subjected to testing.  Allied implemented these changes without any notice to or bargaining with the Union.  Allied does not challenge the propriety of the Board's order with respect to the change in the company's drug-testing policy.  Consequently, this portion of the order is summarily affirmed.  *NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 363 n.2 (5th Cir. 1990).

name for his own benefit; (2) the Board failed to give sufficient weight to the fact that Sanford's behavior was not a common practice; (3) the Board failed to give sufficient weight to the fact that Sanford's discharge was consistent with company practice; and (4) the Board applied the incorrect legal standard to its analysis of the burden of proof.

## A. Allied's challenges to the Board's factfinding

Allied asserts that Sanford forged the grievance for his own personal benefit, not for the protection of Thompson's rights. Allied points to an exchange at the hearing, in which its general counsel asked Sanford, "[d]id you benefit from that grievance in any way?" "Yes," Sanford replied. When asked how he had benefitted, Sanford stated that "[t]he outsourcing of the work slowed down." Allied asserts this proves that Sanford received a *personal* benefit from the grievance, as opposed to a benefit accruing to Thompson or the union in general. However, Allied points to no evidence indicating that Sanford stood to gain financially or otherwise from a reduction in outsourced work.

Allied also asserts that Sanford's actions were not common practice, contrary to testimony presented at the hearing. Allied, however, does not indicate how this fact influenced the Board's decision, or how a different finding by this court would yield a more favorable outcome for Allied. The Board's findings did not rely on this fact, so Allied's argument is immaterial.

Similarly, Allied asserts that the Board did not sufficiently weigh evidence that its discharge of Sanford was consistent with previous personnel decisions. Allied presented evidence to the Board about two employees fired for falsifying time records, in one case

for the direct personal gain of the employee.  Allied attempts to lump these acts into a general category of "employee dishonesty," without regard for the special protections afforded union activity.

The Board concluded that Sanford acted to protect Thompson's interest, not his own, that he believed that his actions were necessary for that purpose, and that his actions did not interfere with the work of others or the operations of the company.  It rested this finding on Sanford's testimony and the other facts presented, which certainly support the Board's conclusion.  Sanford acted only when he believed Thompson would lose his right to file a grievance.  He also admitted his actions to Keeney and withdrew the grievance once he learned that Thompson did not want it to be filed.  We do not overturn the Board's findings of fact on this record.

## B.    The correct legal standard

Allied asserts that the Board should have applied the burden-shifting framework first established in *NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981), and approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400–01 (1983), *overruled on other grounds by Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 277–78 (1994), to determine whether Sanford's termination was legal.  However, that framework applies in mixed-motive cases, when an employee is allegedly discharged for both protected and unprotected activity.  *See, e.g., Poly-America, Inc. v. NLRB*, 260 F.3d 465, 488–89 (5th Cir. 2001) (applying the framework when the employer claimed that it discharged the employee for poor performance).  Here, the

parties agree that Sanford was discharged for signing Thompson's name to the grievance form. If this was protected union activity under the NLRA, it violated 29 U.S.C. § 158 to fire him. *NLRB v. ADCO Elec. Inc.*, 6 F.3d 1110, 1116 (5th Cir. 1993) ("It is elementary that an employer violates section 8(a)(3) and (1) of the Act by discharging employees because of their union activity."). If it was not protected activity, there is no question that Allied would have been within its rights under the CBA to fire Sanford. Consequently, the only relevant question of law is whether Sanford's act constituted protected activity.

Allied concedes, as it must, that filing a grievance is usually protected activity. It asserts, however, that by signing Thompson's name for him, Sanford lost the protections of the NLRA and could be discharged. We have held that "flagrant conduct of an employee, even though occurring in the course of [protected] activity, may justify disciplinary action by the employer." *Boaz Spinning Co. v. NLRB*, 395 F.2d 512, 514 (5th Cir. 1968) (internal quotation omitted). However, "not every impropriety committed during such activity places the employee beyond the protective shield of the act." *Id.* "The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect." *Id.* (internal quotation omitted). Further, "'the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed.'" *Crown Cent. Petroleum Corp. v. NLRB*, 430 F.2d 724, 730 (5th Cir. 1970) (quoting *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965)).

Here, the Board concluded that Sanford acted in the good-faith belief that his actions were necessary to preserve Thompson's claim. It also determined that he derived no personal gain from filing the grievance, voluntarily acknowledged his actions, and promptly withdrew the grievance when he learned that Thompson opposed the filing. Allied challenges these factual findings, as discussed above, but it also asserts that Sanford's activity was not protected as a matter of law.

The Board relied on two cases from our sister circuits in reaching its conclusion. In *Roadmaster Corp. v. NLRB*, 874 F.2d 448, 451–54 (7th Cir. 1989), the Seventh Circuit held that a union official who signed an employee's name to a grievance without the employee's permission was entitled to the protection of the NLRA. More recently, in *OPW Fueling Components v. NLRB*, 443 F.3d 490, 493–97 (6th Cir. 2006), the Sixth Circuit held that a union official who signed the names of two involuntarily transferred employees to a grievance without their permission was entitled to the protection of the NLRA. In both cases, the employer asserted that it fired the employee for falsifying company documents, the same charge Allied makes against Sanford. *Id*. at 498; *Roadmaster*, 874 F.2d at 454. Both courts found that the employer's stated reason for firing the employee was improper, with the *Roadmaster* court noting that the employer "has consistently articulated only one reason for discharging [the employee] . . . . Because we have upheld the Board's determination that this was protected concerted activity, Roadmaster discharged [the employee] solely for engaging in union activities." 874 F.2d at 454. The *OPW Fueling* court agreed with the district judge's determination that the employer's proffered reason

for firing the employee was merely a pretext for anti-union animus. 443 F.3d at 498. Both courts found, in concurrence with the Board's determination, that the employee in question acted in good faith to preserve the employee's rights and without any intent to deceive the employer. *Id.* at 496–98 (discussing and applying *Roadmaster*).

As discussed above, Sanford acted to preserve Thompson's rights to overtime pay. Nothing in the record indicates any other motive behind his actions or bad faith on his part in pursuing this grievance. The record indicates that Sanford had previously taken steps to prevent the outsourcing of work (and received an assurance that the company would cease outsourcing), so his actions were entirely consistent with this concern. The simple act of signing a grievance to preserve a fellow employee's rights does not, as a matter of law, rise to the level of "flagrant conduct" that would strip the employee of the NLRA's protection. Consequently, we find that the Board's conclusion that Sanford was discharged for engaging in protected activity is not illogical or arbitrary, and we thus refuse to disturb its conclusion.

## IV. CONCLUSION

For the foregoing reasons, we GRANT the Board's application for enforcement.